Good morning. My name is Alma David, and I'm the pro bono counsel for Salito Chiluvane. I will try to reserve three minutes for rebuttal. Thank you. Your Honor, this case, as you obviously know, has a long history and a lot of complex issues. And there's just a few that I'd like to focus on today. And one of the central issues in this case is a question of whether the kind of abuse that Mr. Chiluvane alleged he suffered in Mozambique in the mental institution in which he fears upon return, should he be institutionalized again in Mozambique, whether that kind of abuse constitutes torture under this circuit's case law. And obviously, you know, when we're talking about somebody receiving treatment for a mental illness in a hospital setting, and we're talking about whether or not that's torture, it's a very important and diligent in our line drawing. The Ninth Circuit in the past has made a decision that the agency relied upon heavily and that the respondent cites in his brief, which is Villegas v. Mukasey. And that was a case in the Mexican context where we had the Ninth Circuit on a quite limited record decide that in a situation where there was a hospital in Mexico, but where there was also evidence that the Mexican government was making steps to improve those conditions and that the record in that case didn't compel the conclusion that the staff in those mental institutions intended to torture the patients in those hospitals and that the abuse that the petitioner may suffer would not constitute torture because those conditions could be attributed to negligence or to a misunderstanding of the nature of mental illness and to poverty in that country. What the Ninth Circuit didn't say, and that was recognized recently by this court in the Quesgada v. Barr, which I cited in my reply brief, it doesn't mean that we can't ever find torture in mental institutions. Well, let me ask you this, counsel. You seem to want to reference international standards on torture. And, well, I think that can be laudable. We're bound by the Ninth Circuit. So if the international standards are different than the Ninth Circuit case law, am I correct that we have to apply our case law? Yes, that's true, Your Honor. I would say that the Ninth Circuit, when looking at torture and relief under CAT and also the asylum law, has quite heavily in the past referenced international law. So just recently, what was the case? Well, Nasrallah, first of all, talks about how CAT, because it's the Convention Against Torture, how Congress did hew quite closely to the Convention Against Torture and the government cited that case in their 1928 J letter. But there was a recent case in the Ninth Circuit that referenced the UNHCR and UNHCR standards very heavily. I'm sorry, it's Diaz-Reynoso v. Barr, 968 F3rd 1070, Ninth Circuit 2020. So yes, it's true, we have to look at Ninth Circuit case law, but in the context of CAT and asylum, the Ninth Circuit has often looked to guidance from the UNHCR and the UNHCR appoints a special repertoire on torture. And you kind of anticipated, Your Honor, where I was going next with this, which is that one of the sources of guidance we can look at when we're looking at the kind of treatment that's provided in mental institutions is the guidance of the special repertoire on torture. And that particular guidance was actually cited also in Diaz-Reynoso v. Barr. And I realized that the procedural posture is obviously different in that case, because in that case, the immigration judge had found that there was torture and the board had overturned that, and that was now before the Ninth Circuit. But the guidance by the special repertoire on torture was specifically cited by the judge in that case to support the reasonableness of the IJ's conclusion that, in fact, torture had occurred. And so it seems to me, there's a couple of things that make your case a little bit tricky. And I mean, obviously, your client suffers from mental illness. So there are that IJ does not make an adverse credibility and has to take into consideration your client's mental illness. But there's also testimony in the record that your client is not a very good historian. And so if he didn't have mental illness, probably he could have had an adverse credibility determination because of discrepancies and inconsistencies in the testimony. But that doesn't occur here. And he's given the benefit of what he thinks might have occurred, whether it's reported or not. But the IJ goes, well, several times, and they go back. And then there are the incidents with the police that are reported one way. And then the IJ makes certain factual findings about not finding an intent to torture. So we've got to take the factual findings and review them in one way. And then the ultimate has to compel another result. And when your client talks about how he would be tortured, he sets a number of hypotheticals up. And the IJ goes through each one of them and says, well, this would have to happen, this would have to happen, this would have to happen. And I think the family can help him. So I don't think he's going to necessarily end up involuntarily committed. And so you have this kind of weaving through all of these things. And so I'm wondering when you apply the standards of review, how do you prevail? I mean, the IJ could have gone your way, but didn't. And if there's a basis for going the other way, if it doesn't compel another result, that's a harder rock for you to push uphill. Well, sure. I mean, I think that different standards of review get applied to different parts of kind of the history that you just laid out. When we talk about the sequence of events that needs to happen, yes, we review that under the substantial evidence review. And so I need to show or we need to show that the record compels the conclusion that the agency was incorrect. And I think we can do that. And the immigration judge's factual findings break down in that first link of that chain that she alleges that the petitioner's family is going to be able to take care of him. I mean, the record, you know how long the record is. And I can point out all of the sites in the record to the incredibly long and convoluted psychiatric history and treatment history that my client has had just at the Northwest Detention Center and the number of times his medication has had to shift. And despite the medication, there were suicide attempts and there were times where he was, you know, hearing voices and having these auditory hallucinations and not oriented to time and place. And then we have evidence in the record, letters in the record from the family members, you know, from his mother saying that she's old and she can't really support him and from his sister saying she can't support him and she lives in Denmark. Well, no, it's undoubtedly sad. There's no two ways about that. But we have to separate all of that. And there's one I'm assuming you think that cat is your best chance as opposed to the other relief that he's seeking. Because I note on the particularly serious offense, I think the government filed, well, the government filed a 28-J letter citing a case bar that you were contesting that the history of abuse of his wife shouldn't be considered, even though I think the IJ kind of separated that out and looked at the incident itself. But would you concede that bar makes your argument more difficult in that area? Well, I would absolutely concede that bar makes my argument more difficult with regard to the evidence that was considered. I will point out that bar reminds us that the first step in the particularly serious crime determination is to look at the elements of the offense and to decide whether looking at the elements of the offense that brings the crime in the ambit of a particular serious crime. And the board looked at the wrong offense. Well, then Robinson came out and it went back. And then they looked, then he got another bite out of the apple on that. Sorry, I'll continue. No, go ahead. The judge always reviewed assault as the particularly serious crime. And the board somehow on appeal claims that we were looking at the felonious harassment offense, which is not true. It was always assault. And so it just. Well, didn't what it wasn't there a remand under Robinson and not a Ninth Circuit remand, but a remand under Robinson, which so when it went back, I am sure the government's going to respond to that and say when it went back, they were looking at the harassment, not the felonious assault. That is what the government said, but that's not actually what the judge did. So they he was. Well, it's all one set of facts, though. It's one incident where her her lungs perforated and he won't let her go to the hospital and all of that. And I'm not I'm not disputing that, that that this new case, Bayer or Barr, however it's pronounced, makes the argument about the evidentiary standard more difficult for my client. I agree with that. OK. And so I just do want to go back to the question of torture. And I think it's important for us here to look at two different things. One of them is the kind of abuse that my client alleges and that the country conditions demonstrate occur in these mental institutions, which could potentially be and the government alleges this kind of implies this could be seen as treatment. And that is prolonged restraint and potentially even being put in solitary confinement. And I will point out that the Special Rapporteur on Torture, who is appointed by UNHCR to whose guidance this court has frequently cited, specifically says, and it's in the administrative record at pages six hundred and thirty seven and six hundred and thirty, that there is no therapeutic justification for the use of solitary confinement and prolonged restraint of persons with disabilities in psychiatric institutions. Both prolonged seclusion and restraint may constitute torture. Moreover, any restraint on people with mental disabilities for even a short period of time may constitute torture and ill treatment. So that's one set of abuses. The other set of abuses, and I see I'm about to be out of time, but I just want to mention this, is that aside from demonstrating that people are subject to involuntary restraint and seclusion or solitary confinement, they're also beaten and they're burnt with cigarettes and they're insulted and and they're they're beaten with wires. So this is all in the record. And I don't think that Vegas, when the Vegas court was talking about squalor and about unpleasant conditions or even trying to excuse that through negligence or poverty in that country. I don't think this court was trying to say, but it's OK in a mental institution if somebody beats a patient or burns them with cigarettes, that that still doesn't adhere a specific intent. So if you want to save your time, I'll ask the government about what you're raving here. Thank you. Thank you. Good morning. Morning, your honors. May I please support Jessica Daubert for the government? This court should deny the petition for review for two reasons. The first of which is because the petitioner has not demonstrated an error in the particularly serious crime determination. And second is because no record evidence compels reversal of the determination. I'd like to just ask you a procedural question here. I know he had a lawyer earlier because of his lack of competency at some point. Right. But it's not this lawyer. This lawyer is pro bono. It's a different it was a different lawyer. No, I believe at different times. He had one attorney who then either moved or ceased practicing in the jurisdiction. I believe she moved. And then Miss David did represent him before immigration court appointed as part of the case. Right. So the question, I guess what she's saying, there's a couple of things that maybe you want to address that the getter. A case seems to suggest that evidence of primitive and abusive practices on mental health patients can support an inference of specific intent to inflict harm. Can you explain why we should not make such an inference here? And maybe also you can wrap into what her. She the U.N. report that petitioner site seemed to suggest that beating and typing up mental health patients is is tying them up is torture. Can such a report inform our understanding of the torture under cat? So I think those are kind of things that she was raising. Maybe you can respond to that. Your Honor, I first like to just note and then I can discuss it after I specifically answer your question, that there is a question as to whether or not there is a lot of controversy over this issue, because Mr. Chula Vane was removed after he sought to lift the state of removal in this case. But I will address your question first and then that one. And in terms of the whether or not the torture could be this could be presumed, essentially under the law, is separate from the issue, is distinct from the issue here, which is there is a factual determination that there is no specific intent to torture this individual. That's the decision that's before this court. It's a fact. Was that made on remand after when the BIA remanded back the first time to the IJ or something? Or there was more than one remand back? There were a couple of remands back. Correct. And the factual determinations about Kat were made on remand. And they're part of the 2017 immigration judge decision. And those determinations and specifically in that decision, the immigration judge did exactly what the board asked her to do. Immigration judge went through all of the evidence and made more specific factual findings regarding the evidence of the harm that he suffered, as well as whether or not there is a specific intent to torture individuals with mental health issues in Mozambique. And and that's the the crux of this case. If you look at the career case, as well as the Vegas case, it must be a specific intent to torture individuals. It can't just be poor conditions that are squalor or might rise to the level of torture under the U.N. report. It has to be a specific intent to treat those individuals. And that's the distinguishing factor between the Vegas case and the N.A. case. In the N.A. case, Nigerian prison officials specifically with single individuals out for mistreatment because of their HIV status. Conversely, in the cases that have found no specific intent, there's been massive amounts of evidence of poor conditions, of lack of knowledge of how to treat individuals, of lack of resources. And and that's just insufficient. If you look at the Vegas case itself, it says, well, Vegas is correct. That a variety of evidence showed that Mexican mental patients are housed in terrible squalor. Nothing indicates that Mexican officials or private actors to whom officials have acquiesced, created those conditions for the specific purpose of inflicting suffering upon the patients. The Board of Immigration Appeals has a similar statement in its 2020 decision in matter of RAF. And it says it is not enough to show that the substandard conditions and mental health facilities, pretrial detention and prisons in Mexico are the result of negligence, lack of resources or insufficient training and education, particularly where the government is making efforts to improve those conditions. Can I ask a question about this? Can I ask a question about your specific intent argument? I hope I'm not getting you off track, but I just question how we how do we line this up? I don't question the authorities that you're citing, but I'm not sure how we reconcile it with some of our other case law. So, for example, we've granted relief in cases where where women have claimed to be that they would be subjected to female genital mutilation, not because somebody intended to torture them, but because there's a cultural norm where they come from. So so how do you reconcile those cases where I don't think there was a specific intent to torture with the argument you're making today? Yeah, I think that those cases and the other the other line of cases that would immediately come to mind would be some of the Chinese family planning cases where the ulterior motive may not be in a specific intent to torture those individuals. But if you look at the more recent case law coming from the circuit and other circuits, particularly with regard to cat, is that there there really must be an individualized assessment for each cat case and each claim. And you must individually look at what the threat is and what the cause of torture is and what and akin to the withholding context of the persecutors motive. You must look at what is the motive behind the the actions as to whether or not they constitute torture. I think the Madrid case would probably support that analysis as well. And so in terms of comparing it to FGM cases, that's that's a that's a tough line to draw, because those cases don't necessarily establish a per se category, but they do. They do require that there be evidence of a specific intent to commit that act on that person. Right. That that has to be part of the analysis. And here there's no you have to show a specific intent to commit an act that constitutes torture on this individual. And that's just not there. If you look at the evidence in the record of the country conditions, there's lots of evidence and most of it demonstrates that there's a lack of cultural understanding with regard to mental health issues and that society accepts the mistreatment, but that the progress is being made. And also, if you look at I had a case that I was going to the Rodriguez Arias case, that case was remanded on a different issue. But that one also recognized that there has to be an individualized assessment that this particular person would be specifically targeted and that the target would be something that would constitute torture and not just a lack of poor conditions. Not sure that that sufficiently answered your question, but that did get me to where I was. I appreciate your response. I just think I think you're right. I think it's a very tough line to draw. So I appreciate your response. Thank you. Just one one one follow up question. I just don't understand your argument. Going back to the situation that your adversary mentioned about solitary confinement. So assuming for the sake of argument that solitary confinement in these kinds of circumstances can operate as as if it were torture. If someone puts someone into solitary confinement. Let me give two possibilities as punishment. For their having done something like would happen in a prison, for example, all the time in the United States. Do you need more than that to satisfy the specific intent if the solitary confinement is, in fact, the equivalent of torture? Does the fact that the intent was to punish for a misdeed mean that there wasn't a specific intent to torture? Probably. I think that that would that'll take me into the hypothetical chain of events argument that I'm happy to discuss. But I think that you would need more than just a simple fact that an action could constitute torture and that action happened as punishment. There are numerous. So isn't isn't I mean, the usual reason for torture, state sponsored torture is either punishment or to try to obtain information as in waterboarding. The so how do you draw? I'm having real difficulty in how you draw that line. Well, I think the line would be drawn in two ways. The first way is with this court's case law and circuits across the country that have said that punishment for a crime is not torture. Right. Punishment under criminal laws of that country is not torture. Number. So if it was actually solitary confinement as a punishment for a crime that was committed, that would be that would fall under that case law. If it was solitary confinement because they didn't because, for example, hypothetically, the individuals did not know how to react to someone with a mental health problem. And that person was acting out, which may be more in line with the fact that this case, that's where we come into all of the case law that talks about that. That action is bad. But what you have to show is a factual matter, that the action must be specifically intended for the purpose of torturing. And I just would like to say the Guerrero case in that regard and that in that case, the immigration judge had found that Guerrero would be harmed for a prescribed purpose. And the board said, not really. It's not clear that the that that would happen. And. And this court remanded it because it's a factual determination as to what that specific intent was. So as a specific intent to punish the person for a crime or as a specific intent to torture them or as a specific intent to try to treat them with a lack of resources to do so appropriately. Only one of those would actually qualify for capital. So here are the specific intent determinations that when it was sent back, it was looked at. He claimed past torture by the police. Right. He claims past torture by the police and the agency's analysis in this case was that there's just insufficient evidence to support that assertion. It's not an average credibility finding, as your honor mentioned, is that the evidence presented, even considering the truth of his speculative beliefs that that what he believes happened, he believes happened. The evidence just does not support that. It's possible that he had traumatic brain injury, but the MRI was inconclusive. It's unclear whether that came from a door hitting him in the head or another source. It's not clear what kind of beatings he might have sustained at the hands of police. And all of that combined, the immigration judge went through each single allegation of potential harm and said, even if some of this happened, it doesn't rise under the case law to qualify as torture. And it cited several cases in analyzing that this type of minor beatings just does not rise to the level of torture. And so there was no past torture from the police. There was no specific intent to harm him from the hospital and from the hospital staff. And then looking to whether or not he demonstrated a clear probability of future persecution. The immigration judge looked at the hypothetical chain, and the hypothetical chain was that he would not have access to medication, that he would act out without his medication, that he would end up in the hands of police or the psychiatric staff, and that he would then be tortured. And each single step would have to be demonstrated more likely than not. And the immigration court said that it failed at three of the four steps, the first, the third and the fourth. The third being it's not more likely than not that he would be involuntarily hospitalized. It's not clear from the record that he was involuntarily hospitalized in the first instance. And so it's not clear now, knowing having being armed with more knowledge about his mental illness, that he would be involuntarily hospitalized upon return. Next, it's speculative that he would go without treatment and would be singled out for torture. Not only was he not singled out for torture in the past, but the evidence demonstrates that the government is really working hard to try to provide more resources in the mental health field. So there's just insufficient evidence to compel the conclusion that he will be singled out for torture upon return. And yes. Oh, well, I think with the time remaining, you sort of threw out, you said this might be moot. I didn't quite understand that because you said he's he's in Mozambique at this time. How would that be moot then? I don't quite understand that. Sure. Under this course of case, a lot of car K.A.U.R. There is if somebody voluntarily returns, they have abandoned their applications for withholding of removal and cat. And this wasn't explicitly breached in this case, admittedly. And if the court would like, I'd be happy to submit a supplemental brief on the issue. But it does go to the court subject matter jurisdiction, which you can consider. And and really the crux of the argument there with my 30 seconds left is that somebody who moves to lift a state of removal and seeks return as as Mr. Chilling did. And the only case or controversy that would be left would be an attack on the removal order itself, which he has conceded. He's removable as an aggravated felon and that any collateral consequences that would remain could be still litigated. But there are no collateral consequences. They would all rise and fall within the withholding of removal claim and cap claim. So did he go back on his own or did we take did we give him a ride? We gave him a ride. He moved to lift the state of removal in September of 2019 and he was removed in November of 2019. OK, do either of my colleagues have any additional questions of Miss Doggart? No, thank you. OK, thank you. All right. We'll return to you, Mr. B. And I just want to touch on a few points. So, Judge Rakoff, you you raise the question of whether somebody who was punished for a crime, whether that would constitute torture or that would adhere to specific intent to constitute torture. And the answer is no, because under the CAT, there is an exception for punishment that's inflicted incident to lawful sanction. So it's a lawful sanction. And that doesn't adhere to specific intent. And but one of the it doesn't only have to be intent to punish some of the prescribed purposes under CAT are also discriminatory intent. And and the record here is replete with evidence that people with mental illness are you know, there's a lot of stigma and discrimination against them in Mozambique. And so that would go to the issue of of the intent. And there's Kristen. I was really happy that you brought up the FDM issue and thank you for doing that. It was actually further down in my notes. I never got to making that comparison. But I actually think it's it's an apt comparison because I think it's important for us to take a step back and talk and think about what we're actually talking about. We're talking about a person who is in a mental hospital and under the control of the staff. They're not only in the throes of psychosis, being restrained and being put in solitary confinement, but we're also talking about that person being beaten. And we're talking about that person being burned with cigarettes and we're talking about that person being whipped with ropes and cables. And so we can't just look then and say, well, maybe they didn't under maybe people don't know better or maybe this is a matter of culture when we can infer. And and Respondents Council keeps talking about we have to show the specific intent to torture. No, we have to show the specific intent to inflict severe pain. And it is difficult when you're when you see somebody beating somebody or burning them with cigarettes to not think that they are to not conclude that they have the specific intent to inflict severe pain or suffering. Can you respond to that? The mootness argument? Your Honor, it's the first time I'm hearing about it. My understanding is that the response that the petitioner's petition can continue even after he's removed. And it is true that the petitioner moved to lift the stay of removal. And as you can imagine, as his attorney dealing with a client has been detained in immigration detention for seven years and dealing with severe mental illness. I was not a decision that was made lightly or that was easy to make, but he was very clear and that he could no longer remain in the detention center. And the only other option for him in that case was to ask for the stay of removal to be lifted because he was not he was not released. He was not able to be released on bond. I'm assuming he's not in a mental facility right now or you would have told me. I'm unfortunately, I have no idea where he is, Your Honor. I was contacted by him once or twice right after he was removed and I hadn't heard from him since. OK, I don't know where he is. All right. We've asked you a lot of questions. If you want 30 seconds to wrap up, go ahead. We're in overtime, but go ahead. Thank you. I just want to draw the distinction between Villegas, which talks about squalor and what we're talking about here. We're not talking about squalor. We're not talking about conditions. We're talking about very specific physical abuse like beatings and restraint and being burned by cigarettes. And it is true that Villegas says we have to look exactly at the record before us. I would ask the court to do that and not just to kind of rotely rely on Villegas, but to really look at the conditions and the record for it. Thank you. Thank you. Did either of my colleagues have any additional questions? All right. Well, thank you both for your helpful arguments in this matter. This will be submitted. I do want to. While we appreciate everyone appearing, we as a court especially appreciate people doing pro bono work for people that need assistance. So I realize you're not a part of our court pro bono program, but that you're doing this pro bono. And we thank you because it obviously assists the court in going through the legal issues and discussing the record, particularly where there's someone that has mental health issues and it will be more difficult. So thank you both for your helpful argument today. This will stand submitted. The next matter on calendar is Ali Chalas versus William Barr one nine dash seven one zero zero eight. That matter has been submitted on the brief and will be submitted as of this date. The last matter on calendar today is Isidro Carlon Bonilla versus William Barr one eight dash seven three one zero one. That was submitted on the brief and it will be submitted as of this date. That concludes our calendar for today. So this court will stand in recess until tomorrow morning at nine thirty a.m. And we'll wait to be removed to the roving room.
judges: Callahan, Christen, Rakoff